**HYUNDAI CORP., U.S.A., and Inchon Iron & Steel Co., Ltd., Plaintiffs,**

**v.**

**The HULL INSURANCE PROCEEDS OF the M/V VULCA, and Vulcan Navigation Corp. and Hyundai Merchant Marine Co., Ltd., Defendants.**

**Civ.A. No. 90–1589 (HAA).**

United States District Court,
D. New Jersey.

Aug. 10, 1992.

---

Stephen V. Rible, Bigham, Englar, Jones & Houston, Newark, N.J., for plaintiffs.

Michael J. Ryan, Hill, Betts & Nash, Jersey City, N.J., for defendants.

## OPINION

HAROLD A. ACKERMAN, District Judge.

On December 31, the M/V Vulca ("Vulca"), on sail from New Jersey to South Korea, sank in the Pacific Ocean approximately 700 miles northeast of Hawaii. The sinking resulted in the complete loss of all cargo on the ship, and this cause of action springs from that loss. Currently before the court is a motion by defendant Hyundai Merchant Marine Co. ("Merchant Marine") for summary judgment pursuant to Fed. R.Civ.P. 56(b). Merchant Marine argues that it is not liable to plaintiffs for damages resulting from the lost cargo.

### I. Standard for Summary Judgment

Summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See *Todaro v. Bowman*, 872 F.2d 43, 46 (3rd Cir.1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3rd Cir.), cert. dism'd, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Put differently, "summary judgment may be granted if the movant shows that there exists no genuine issues of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital*, 843 F.2d 139, 143 (3rd Cir.1988), cert. denied, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material if it influences the outcome under the governing law. Id. at 248, 106 S.Ct. at 2510.

Within the framework set out above, the moving party essentially bears two burdens: First, there is the burden of production, of making a prima facie showing that it is entitled to summary judgment. This may be done either by demonstrating there is no genuine issue of fact and that as a matter of law, the moving party must prevail or by demonstrating the nonmoving party has not shown facts relating to an essential element of the issue for which it bears the burden. Once either showing is made, this burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. Second, there is the burden of persuasion. This burden is a stringent one which always remains with the moving party. If there remains any doubt as to whether a trial is necessary, summary judgment should not be granted. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 330–33, 106 S.Ct. 2548, 2556–58, 91 L.Ed.2d 265; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970); Advisory Committee's Notes on Fed.Rule of Civ. Proc. 56(e), 1963 Amendment; see generally C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (2nd ed. 1983).

### II. Background

In the shipping industry, a party wishing to ship cargo from one point to another is a shipper, and the party that contracts to transport the goods—usually the shipowner—is the carrier. Often, a shipper will have enough cargo to fill an entire vessel. In this case, the shipper may charter a vessel from the shipowner. A charter agreement is termed a "charter party" and constitutes "a specialized type of maritime contract for the hire of a vessel." Thomas J. Schoenbaum, Admiralty and Maritime Law 381 (1987). Charter parties come in three forms. In a demise charter, the charterer takes full control of the vessel for a certain period of time,

controlling its schedule as well as providing the crew and navigation. A time charter, on the other hand, involves the charterer controlling the voyages for a specific time period while the shipowner retains possession of the ship and responsibility for the navigation. In a voyage charter, the charterer contracts to use the ship not for a particular period of time but for a particular voyage. In both time charters and voyage charters, the charterer generally uses the entire ship to ship its cargo. However, unless the charter provides otherwise, a charterer may subcharter the vessel. For example, a time charterer, when not using the entire ship, may contract for a voyage charter party with another shipper. When a carrier loads a shipper's goods on the vessel, the carrier or its agent issues and signs a bill of lading. A bill of lading not only acknowledges the receipt of cargo but also provides a contract of carriage between the shipper of cargo and the carrier of the cargo.

In this case, the undisputed facts disclose the following scenario:

On October 5, 1989, defendant Merchant Marine entered into a voyage charter party with a shipper called Clarendon Ltd. In this charter, Clarendon contracted to have Merchant Marine arrange for the shipment of Clarendon's cargo. The voyage charter specified that Clarendon would provide to Merchant Marine a cargo of scrap for a ship voyage.

The Voyage Charter Party provided (Merchant Marine is referred to as "owners" and Clarendon is referred to as "charterer"):

> Owners are to be responsible for loss of or damage to the goods ... only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods ... or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the person act or default of the Owners of their Manager.

On October 6, 1989, Merchant Marine negotiated a time charter party with Vulcan Navigation Corporation ("Vulcan"), the owner of a ship called the Vulca, for the purpose of transporting the cargo of goods covered by the voyage charter between Merchant Marine and Clarendon. Under this time charter, Merchant Marine contracted from Vulcan to use the Vulca for a particular period of time. As with most time charters, the shipowner—in this case Vulcan—retained possession and control of the ship during the chartering period. The time charter in this case provided that:

> The Captain (although appointed by the Owners), shall be under the orders and direction of the Charterers as regards employment and agency; and Charterers are to load, stow, discharge and trim the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading....

> However, at Charterer's option, Charterers or their agents may sign Bills of Lading on behalf of the Master.... [T]he Charterers shall indemnify the Owners against all consequences or liabilities that may arise from any inconsistency between this Charter and any Bills of Lading signed by the Charterers or their agent."

In November of 1989, Clarendon nominated Overseas Shipping, Inc., to serve as a port agent to issue a bill of lading for the cargo of scrap. On November 5, 1989, the Master of the Vulca issued a notice authorizing "Overseas Shipping, Inc" to sign and issue bills of lading for Clarendon's scrap metal cargo. The bill of lading was issued to Clarendon, but subsequently was negotiated to plaintiff Hyundai Corporation, U.S.A. ("Hyundai"), when the cargo of scrap was sold by Clarendon to Hyundai.[1]

In November of 1989, the Vulca arrived in Jersey City, New Jersey, prepared to carry the shipment of scrap from the United States to Inchon, South Korea. Pursuant to its authorization by the Master of the ship, a representative of Overseas

---

1. Unless specifically stated on the bill of lading, a bill of lading is assignable.

signed the bill of lading on behalf of the Master (captain) of the Vulca. While the Overseas representative signed an affidavit that she "[did] not know who authorized the Master to issue said instructions" and that she "had received no specific instructions from either Hyundai Merchant Marine Co., Ltd. or Vulcan Navigation Corp.", the Master of the ship stated in a deposition that he recalled acting only for the shipowner.

The Vulca sailed from New Jersey on November 15, 1989, first proceeding to the Panama Canal. At the Canal, the Vulca was delayed for repairs. After the repairs were made, the ship sailed to Long Beach, California. In Long Beach, the ship underwent additional repairs. Finally, on December 22, 1989, the ship left California for the last leg of its voyage to Korea. On December 31, 1989, the Vulca sank approximately 700 miles northeast of Hawaii.

With the cargo lost, Hyundai and Inchon Iron & Steel, the cargo underwriter, brought this action against the shipowner Vulcan and the time charterer Merchant Marine for recovery of damages due to the lost cargo. A default judgment eventually was issued against Vulcan.

Now before the court is a motion for summary judgment by defendant Merchant Marine. Merchant Marine argues that since it did not authorize the bill of lading covering the lost cargo, and since it did not commit any acts resulting in the loss of the cargo, it cannot, as a matter of law, be held liable for the damages.

### III. Discussion

A contract for carriage of goods by sea to or from United States ports can be in the form of private carriage or a form of public carriage. When a carrier contracts with the general public for shipping, the contract is considered public carriage, and all bills of lading issued under such arrangements are governed by the Carriage of Goods by Sea Act, 46 U.S.C.App. § 1300 et seq. ("COGSA"). When the contract is in the form of a charter between the carrier and the shipper, the contract generally is considered private carriage,

and COGSA does not apply. However, through a maritime charter party, the owner and charterer (or the charterer and subcharterer) can stipulate through a contractual provision known as a "Clause Paramount" that COGSA applies to bills of lading issued pursuant to the charter parties. Both charter parties at issue in this case contained Clauses Paramount, providing that COGSA would govern the bills of lading issued pursuant to those charter parties.

Once the parties have stipulated that the bills of lading issued pursuant to the charter party are contracts of carriage of goods by sea governed by COGSA, federal law provides that:

[U]nder every contract of goods by sea, the carrier in relation to the loading, handling, stowage, carriage, custody, care and discharge of such goods shall be subject to the responsibilities and liabilities and entitled to the rights and immunities set forth in sections 1303 and 1304 of this title.

46 U.S.C.App. § 1302. Sections 1303 and 1304 provide that a carrier shall be bound to make the ship seaworthy; properly man, equip and supply the ship; and properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried. A carrier may also be liable if it is shown that it did not use due diligence in preparing the ship for the voyage. Thus, the threshold issue in this case is whether Merchant Marine is a COGSA carrier.

In 1979, while writing a seminal opinion in the area of shipping law, Judge Sand noted that "[t]he case law interpreting COGSA provides surprisingly little guidance on the question of who is properly characterized as a carrier for COGSA purposes or on the factors to be considered in making such a determination." *Joo Seng Hong Kong v. S.S. Unibulkfir*, 483 F.Supp. 43, 45 (S.D.N.Y.1979) (hereinafter *"Joo Seng"*). Thirteen years later, this is still the case. Therefore, a brief discussion of the principles behind, and the application of, COGSA is appropriate.

COGSA was enacted because of the confusion about who was liable in the event of

a cargo shipment lost at sea. COGSA attempted to provide shippers a broad array of defendants to sue in the event of a lost shipment of cargo. Defendants who are considered "carriers" are liable under COGSA. Thus, the crucial question in determining liability under COGSA has always been whether a particular defendant—usually a time or voyage charterer—is a COGSA carrier.

Traditionally, courts used agency law principles to determine who the carrier was. To determine the carrier, courts engaged in an analysis designed to determine who issued the bill of lading. Once it was shown that a party issued a bill of lading, that party became a carrier under COGSA and was held liable accordingly. The courts used a variety of factors to determine who issued the bill of lading, including the type of charter, who signed the bill of lading, whose form was used in the bill of lading, and under whose authority the bill of lading was issued. *Joo Seng* at 45–46; *United Nations Childrens Fund v. S.S. Nordstern*, 251 F.Supp. 833 (S.D.N.Y. 1965). This traditional rule has tended to assume that in any given contract for carriage of goods by sea, there can be only one COGSA carrier. Under this test, the shipowner has almost always been held liable, and the time charterer frequently has been found not to have issued the bill of lading. I will call this test the "agency test."

More recently, however, some courts have determined that this agency approach is out of step with the policies of COGSA, which was meant to provide a broad class of defendants for shippers to sue when its cargo is lost or destroyed. This approach began to look not only at who issued or authorized the bill of lading but also at who actually was involved in the shipping contract. As Judge Sand described this approach in *Joo Seng:*

> Although decisions [traditionally sought] to justify the imposition of COGSA liability by finding specific evidence of a "contract of carriage" between the charterer or owner and the cargo interest involved, there is strong statutory support for treating ... all owners and charterers involved in the carriage of the goods at issue as COGSA carriers who are potentially liable to cargo interests under the bill of lading.

*Joo Seng* at 46. Judge Sand continued: "[T]he statutory language of COGSA itself supports a broad definition of the term "carrier." The statute seems to have been deliberately drawn so as not to limit the term to a party to the bill of lading or the contract of carriage." *Id.* at 46.[2]

This "practical" approach had achieved acclaim among commentators. As Professor Schoenbaum has stated, the practical approach comports with the practices of the shipping industry:

> The identification of the carrier issue comes up primarily as a threshold problem of who can be sued on the bill of lading by cargo interests. Agency principles are inappropriate to resolve the matter at this stage. The tangle of relationships between the parties is unclear, and the bill of lading was no doubt issued without significant negotiations between the shipper and any other party. The doctrine that all parties involved in the carriage of the goods are COGSA carriers eliminates the initial skirmishing over the identity of the carrier issue and brings all relevant parties before the court where the ultimate allocation of responsibility for the loss can be ascertained.

*Schoenbaum, Admiralty and Maritime Law* at 313. While this broad approach

---

**2.** Merchant Marine contends that Judge Sand modified his holding in a subsequent case. In that later case, the judge noted that "[e]ven if [the time charterer] was not involved with the issuing of the bills of lading, it may be liable to plaintiff if its agents in fact negligently supervised the cargo operations." *Joo Seng Hong Kong Co., Ltd v. SS. Unibulkfir*, 493 F.Supp. 35, 40 (S.D.N.Y.1980). Apparently, Merchant Marine thinks that under this holding, summary judgment should be denied absent a showing that the time charterer committed negligence. Judge Sand's statement, though, pertains only to ultimate liability, not to a standard for summary judgment. In that case, the judge did not dismiss the time charterer because it may have been ultimately liable.

may be the most practical, though, other courts have felt that while agency principles may be too narrow for application to the shipping industry, the *Joo Seng* approach may be too liberal. For example, Judge Sofaer, when sitting as a judge in the Southern District of New York, modified the practical approach to place at least some initial burden upon the shipper. Directly addressing *Joo Seng*, he argued as follows:

> While it may usually make sense to deem a charterer a COGSA Carrier despite non-involvement in issuance of the bill of lading, that should only be so where there is some evidence that the time charterer might be ultimately liable to the plaintiff as a result of participation in the loading, handling or stowage of goods.

*Agroexport & B.U.O. Assurance International, Ltd. v. S.S. Gordanka Nikolova*, 1983 A.M.C. 1219 (S.D.N.Y.1983). In that case, Judge Sofaer found that:

> When plaintiff alleged damage caused by a defective hatch cover, and where [the time charterer] established that it had nothing to do with [that defect or] with any aspects of the ship's operation, the policy of COGSA to create a broad class of defendants for cargo plaintiffs to sue must give way to the need to protect from further participation in cargo litigation parties with no involvement in either the bill of lading or the conduct alleged to have caused the cargo loss.

*Id.* I do not find the *Joo Seng* decision and the *Agroexport* decisions to be in conflict. Rather, Judge Sofaer was simply noting that the policies behind COGSA do not immunize a plaintiff for the minimal obligation under the Federal Rules of Civil Procedure to state a claim upon which relief can be granted.

■ Both the agency approach and the practical approach provide legitimate grounds for imposing liability. Clearly, if a party can be shown to have issued a bill of lading that is covered by COGSA, that party should bear liability as a COGSA carrier. But in the alternative, even if the defendant is not a party to the bill of lading, that party may still be a carrier under COGSA if the plaintiff shows that the defendant was involved in some way in the issuance of the bill of lading or the loading of cargo and the plaintiff makes a minimal showing that the defendant's actions contributed to the lost cargo.

I will analyze these in turn.

## A. The Agency Test

■ Hyundai contends that Merchant Marine authorized the bill of lading and hence is liable as a COGSA carrier. To assess whether there is a dispute over this material fact, I must analyze the bill of lading in light of the factors noted above.

The first factor asks what type of charter is at issue. Under traditional principles, if the charter is a demise—that is, if the owner relinquished all navigational duties to the charterer—the charterer will be held to be a COGSA carrier. But if the charter is a time charter, and the owner retained responsibility for navigation and loading, the owner generally was determined to be the carrier.

In this case, however, both the time charterer and the owner were authorized to issue bills of lading on behalf of the Vulca. Thus, without more, this factor is dispositive of nothing.

The second factor is: who signed the bill of lading. The bill of lading was signed by a representative of Overseas Shipping, Inc., a port agent nominated by Clarendon, and authorized to sign bills of lading on behalf of the master of the ship. Since the master could have gained authorization to issue bills of lading from both the owner and the time charterer, this factor, without more, also is dispositive of nothing.

The third factor asks on whose form the bill of lading was issued. Generally, when a carrier issues and signs bills of lading, it uses its own forms. In this case, it is undisputed that the bill of lading was not issued on Merchant Marine's form. But it was not issued on Vulcan's form either. Merchant Marine's contention that this factor weighs in its favor, then, is disingenuous. The form only raises the question of

who authorized the bill of lading to be issued.

This question brings us to the last and most important factor—who authorized the bill of lading. Although the bill of lading states that it incorporates the provisions of the "charter party", this provision does not automatically apply all the provisions of the charter party between Merchant Marine and Clarendon to the holder of the bill of lading. Rather, as one court has stated:

> The charter party contract and the bill of lading are two separate and distinct integrated contracts, and ... the mere statement in the bill of lading that it was 'subject to all terms, conditions' of the charter party contract ... could not have the effect of obligating [a party to the charter] to perform the obligations of the parties to the charter party [to the holder of the bill of lading].

*Production Steel Co. v. SS Francois L.D.*, 294 F.Supp. 200 (S.D.N.Y.1968). Thus, there must be something more than the existence of the charter parties to show that Merchant Marine issued the Bill of Lading.

Merchant Marine makes several arguments designed to show that it did not authorize the bill of lading. First, it notes that Carolyn Comer, the manager of Overseas Shipping who signed the bill of lading for the November 1989 Vulca shipment, claimed in an affidavit that she was not authorized by Merchant Marine to issue the bill of lading. In her May 12, 1992 affidavit, Ms. Comer stated that:

> Overseas Shipping, Inc. did not receive any authorization from Hyundai Merchant Marine Co., Ltd. to sign or issue any bills of lading on its behalf in connection with the cargo loaded on board the M/V Vulca ... I signed the bill of lading marked "C" only on behalf of the master pursuant to the authorization given by him. My understanding was that his authorization to sign and issue bills of lading was given by him on behalf of the owner of the vessel and not on behalf of Hyundai Merchant Marine Co., Ltd. who is only the time charterer of the vessel.... The bill of lading form used did

not name Hyundai Merchant Marine Co., Ltd. anywhere on it and, when I signed the bill of lading I was not acting for Hyundai Merchant Marine Co., Ltd.

Persuasive as this may seem, on July 8, 1992, Ms. Comer clarified her May statement. In her revised affidavit, she stated:

> I signed the bill of lading pursuant to the authority of the Master of the M/V Vulca. I had no further instructions from any other party. I do not know who authorized the Master to issue said instructions. I had received no specific instructions from either Hyundai Merchant Marine Co. or Vulcan Navigation Corp.

Merchant Marine wishes the court to find that "Ms. Comer made clear that her understanding was that the authorization given Overseas by the master was on behalf of the owner of the vessel and not on behalf of Hyundai Merchant Marine Co., Ltd." I decline to so find. Rather, the only fact that can be gleaned as a matter of law from Ms. Comer's statements is that Overseas received authorization to issue the bill of lading from the master of the ship.

Next, Merchant Marine cites a certification by the master and captain of the Vulca. Captain Petros Kefalas stated in his certification of June 10, 1992 that:

> Any bill of lading signed or issued by Overseas Shipping, Inc. under that authorization were solely on my behalf as master of the M/V Vulca and for her owners.... I do not recall receiving any authorization from the charterer, Hyundai Merchant Marine, Co., Ltd. to sign or issue bills of lading on behalf of that company or authorizing anyone to sign or issue bills of lading on behalf of Hyundai Merchant Marine, Ltd.

The first sentence of this quote says only that Captain Kefalas was acting in his authority as master of the ship and by signing bills of lading intended to bind the owner of the ship. There is no question, however, that Vulcan would be liable under the bill of lading; in fact, a default judgment already has been issued against it. The question, though, is whether the mas-

ter also could sign or issue bills of lading on behalf of Merchant Marine. In this regard, the master stated only that he did not recall receiving any authorization from Merchant Marine. But the Charter Party between Vulcan and Merchant Marine clearly authorized Merchant Marine, at its own option, to issue bills of lading, and also placed the master at the control of the time charterer. It is up to the factfinder to weigh these facts against Mr. Kefalas' "recollection". It is not a job for the court at this point in the litigation.

Merchant Marine then refers to the affidavit of Captain Yong Ho Shin, allegedly the sole Merchant Marine representative authorized to issue bills of lading on the east coast of the United States for scrap cargos. In his affidavit, Captain Shin states:

> The bill of lading ... was not signed for Hyundai Merchant Marine Co., Ltd. or issued on its behalf.... [I] did not give any authority to sign or issue bills of lading for or on behalf of Hyundai Merchant Marine Co., Ltd. for the cargo or scrap loaded on the M/V Vulca in November of 1989 to Overseas Shipping Inc., the Master of the M/V/Vulca, or anyone else.

If this statement was uncontradicted anywhere in the record, it would be entitled to great weight. However, the record also contains the deposition of S.K. Kang, assistant general manager of Merchant Marine (who was in charge of and familiar with the charters with the Vulca), which may be read to contradict Captain Shin's certification. In his deposition, Mr. Kang states that he sent a telex to Overseas authorizing Overseas to act on behalf of the "vessel charter members", which included "Hyundai [Merchant Marine], owners VULCA...." Further, Mr. Kang notes that Overseas sent Merchant Marine a bill for dealings related to the shipment of steel scrap from Jersey City. While Mr. Kang also testified that Merchant Marine did not authorize Overseas Shipping to sign the bill of lading issued for this cargo, the record contains sufficient seemingly contradictory statements to allow the matter to proceed to the trial stage.

Therefore, I decline to find as a matter of law that Merchant Marine did not issue the bill of lading.

### B. The Practical Test

■ Even if Hyundai is unable to establish that Merchant Marine authorized the bill of lading, it may establish that Merchant Marine is a COGSA carrier by showing that Merchant Marine (1) was involved in the transportation of the relevant cargo; and (2) engaged in actions that wound up causing the loss of cargo. Hyundai clearly passes this test.

As noted above, in most shipping contracts, the relationships between the parties are unclear and the relevant agreements are negotiated quickly and formalistically. If the plaintiff established that the time charterer is somehow related to the voyage, it makes more sense for a court to deny a motion for summary judgment, allow the matter to proceed to trial, and apportion liability at the damages stage. This policy, and the policy of COGSA to provide shippers a broad array of defendants to sue, applies in this case. The record displays the existence of a tangled web of relationships between the relevant parties. And by citing the testimony of Mr. Kang, by establishing that Merchant Marine was the time charterer of the Vulca, and by showing a voyage charter relationship between Clarendon (who ultimately sold the cargo and negotiated the bill of lading to Hyundai) and Merchant Marine for the sole purpose of carrying Clarendon's cargo, Hyundai has shown that Merchant Marine was involved in the instant voyage. Merchant Marine claims it was only a middle man. This may be true, but that is a question more appropriately resolved by allowing the matter to go to trial.

Hyundai seeks to establish Merchant Marine's ultimate liability by alleging that Merchant Marine contributed to the loss of cargo. In this respect, Hyundai asserts in vague language that Merchant Marine improperly loaded the scrap cargo into an obviously unseaworthy vessel while the vessel was in a grounded position. Plain-

tiff also asserts that Merchant Marine directed the Vulca to sail from the port without any inspection of the vessel's hull. Merchant Marine's acts, Hyundai alleges, caused the ship to be unprepared for bad weather, and therefore caused the ship to sink, resulting in the loss of cargo.

Merchant Marine correctly points out that Hyundai's complaint neglects to state these alleged facts that could constitute imposition of liability upon Merchant Marine. Hyundai responded at oral argument on August 7, 1992 that it made this allegation only in the face of Merchant Marine's denials that it issued the bill of lading. This does not excuse a failure to comply with the pleading requirements set forth in Fed.R.Civ.P. 8. Hyundai, then, has fifteen days from the date of the order accompanying this opinion, to move to amend its complaint to state the cause of action alleged in its briefs in opposition to Merchant Marine's motion.

## CONCLUSION

For the foregoing reasons, Merchant Marine's motion for summary judgment is denied.