**INDUSTRIAL PRODUCTS INTERNATIONAL, INC., a Colorado Corporation, Plaintiff–Appellee and Cross–Appellant,**

v.

**EMO TRANS, INC., a New York Corporation, Defendant–Appellant and Cross–Appellee.**

No. 96CA0230.

Colorado Court of Appeals, Div. IV.

Oct. 30, 1997.

Rehearing Denied Dec. 26, 1997.

Certiorari Denied Aug. 31, 1998.

Michael F. Deneen, Ethan A. Jacobson, Lakewood, for Plaintiff–Appellee and Cross–Appellant.

James R. Benson, Jr., Denver, for Defendant–Appellant and Cross–Appellee.

Opinion by Judge ROY.

This proceeding involves damage sustained to a shipment of goods from England to the United States. Defendant, Emo Trans, Inc., a freight forwarder, appeals the trial court's judgment awarding damages to plaintiff, Industrial Products International, Inc. We remand for further proceedings.

In November 1991, plaintiff began negotiating the purchase of industrial insulating material from a supplier in Middlewich, England, for resale to a customer in Lumberton, Texas. On January 20, 1992, defendant transmitted to plaintiff an "ocean freight quotation" for shipping the goods in a 20–foot container, "door to door." On January 21, 1992, plaintiff sent a letter to defendant engaging it and requesting information regarding the shipment date and estimated time of arrival.

Both parties understood that the exchange of letters constituted a contract, though defendant asserts there were additional terms later detailed on the reverse side of its invoice. Also, both parties understood that shipping the goods "door to door" meant that they would be placed directly into a dedicated container at the supplier's premises by the supplier and would remain in that container until arrival at the customer's premises. Based on this shipping term, plaintiff advised its supplier to package the rolls of insulation in plastic rather than in cardboard boxes.

Defendant engaged the services of another and unrelated company, Emo Air Cargo, which engaged yet another company, Ware Transport, to pick up the goods from the supplier in England. On the day the goods were picked up, an agent for Emo Air Cargo contacted defendant and advised that it would be cheaper to ship the goods less-than-container-load (LCL), which meant that the goods would be placed in a larger container with other goods. Defendant, believing cost was the paramount consideration to plaintiff and without consulting either plaintiff, the supplier, or plaintiff's customer, immediately advised the agent to ship LCL.

The goods were picked up and loaded loose onto a truck. An agent at the groupage container depot who signed for the goods noted on Emo Air Cargo's delivery form, "some bales open with contents dirty." The goods were then placed into a 40–foot non-dedicated container along with other unidentified goods. The container was placed aboard an ocean freighter for transport to Houston, Texas. Upon arrival at Houston, the goods were removed from the container, placed loose on board a truck, and transported to plaintiff's customer in Lumberton, Texas.

Defendant sent an invoice to plaintiff which reflected a lump sum freight charge and a separate customs charge in accordance with the agreement. On the back of the invoice, however, were terms in very small print which, inter alia, limited defendant's liability for goods damaged during shipment to $50 per package. Plaintiff, unaware that the goods had arrived damaged, paid the invoice. Ultimately, the actual cost of shipping the goods exceeded the agreed upon charge and defendant lost money on the transaction.

Plaintiff's customer advised plaintiff that the goods had arrived badly damaged with only three out of thirty rolls being salvageable. Plaintiff brought several claims against defendant, seeking damages for breach of contract, breach of implied warranty, and negligence. The parties filed cross-motions for summary judgment based on affidavits and an agreed statement of facts. The trial court granted defendant's motion in part, ruling that defendant was not a bailee, and denied the remainder of both parties' motions.

Following trial, the trial court entered detailed and comprehensive findings of fact and conclusions of law. The court found that the contract between the parties was evidenced by the exchange of letters between the parties · and specified the use of a dedicated container. The court refused to give effect to the limitation of liability terms printed on the back of defendant's invoice because it determined they were not terms to which the parties had agreed.

The court further found that defendant had breached the express terms of the contract by failing to ship in a 20–foot dedicated container but also found that plaintiff had offered insufficient evidence that the breach had caused the damage. The trial court concluded, however, that the Carriage of Goods by Sea Act, 46 App.U.S.C. § 1300, et seq. (1994) (COGSA) and the common law of deviation both applied to the transaction, the former shifting the burden of proof as to the cause of the loss to defendant and the latter resulting in defendant becoming, essentially, an insurer of the goods.

The court concluded that defendant was liable for damage to the goods because it did not offer sufficient proof that its deviation did not cause the damage. The court awarded plaintiff $19,840.50 in total damages and interest from March 16, 1992. This appeal followed.

## I.

Defendant first contends that the trial court erred in concluding that defendant, which was acting as a freight forwarder, was a "carrier" subject to COGSA liability. We conclude that remand for further consideration of this issue is necessary.

COGSA applies to "carriers" who enter into contracts for the carriage of goods by sea to or from U.S. ports. 46 App.U.S.C. § 1300(1994). A "carrier" is defined as "the owner or the charterer who enters into a contract of carriage with a shipper." 46 App. U.S.C. § 1301(a) (1994).

■ Under COGSA, if cargo is damaged, the shipper or owner need only prove that the cargo was damaged while in the possession of the carrier, and the burden of production then shifts to the carrier to show either its due diligence in preventing the loss or that the loss falls within a statutory exception. 46 App.U.S.C. § 1304 (1994); *Sun Co., Inc. v. S.S. Overseas Arctic*, 27 F.3d 1104 (5th Cir.1994). The trial court concluded that defendant did not meet this burden.

Courts have struggled to apply COGSA's definition of "carrier" in determining which of the multiple parties typically involved in the shipment of goods overseas is a "carrier" for purposes of COGSA. From this struggle, two general principles have emerged.

■ First, a carrier is a party with whom the shipper has a contractual relationship, evidenced most often, but not exclusively, by the issuance of a bill of lading. *Hyundai Corp. v. Hull Insurance Proceeds of M/V Vulca*, 800 F.Supp. 124 (D.N.J.1992), aff'd, 54 F.3d 768 (3d Cir.1995); *Hoffmann–LaRoche, Inc. v. M/V TFL Jefferson*, 731 F.Supp. 109 (S.D.N.Y.1990); *Zima Corp. v. M.V. Roman Pazinski*, 493 F.Supp. 268 (S.D.N.Y.1980); *Trade Arbed, Inc. v. S/S Ellispontos*, 482 F.Supp. 991 (S.D.Tex.1980); *Joo Seng Hong Kong Co. v. S.S. Unibulkfir*, 483 F.Supp. 43 (S.D.N.Y.1979). Second, for the purposes of COGSA liability, more than one party may

be a carrier with respect to a shipment. *Hyundai Corp. v. Hull Insurance Proceeds of M/V Vulca, supra; Trade Arbed, Inc. v. S/S Ellispontos, supra; Joo Seng Hong Kong Co. v. S.S. Unibulkfir, supra.*

Beyond this, courts have looked to a variety of factors in determining whether a party was a carrier and therefore subject to COGSA. Traditionally, freight forwarders have not been considered carriers. See *J.C. Penney Co. v. American Express Co.*, 102 F.Supp. 742 (S.D.N.Y.1951). More recently, however, courts have developed a list of considerations for determining whether a freight forwarder is a carrier.

Here, the trial court relied primarily on *Joo Seng Hong Kong Co. v. S.S. Unibulkfir, supra,* in which the plaintiff sought to impose liability for a shortage of soybeans upon the party with which it contracted to ship the soybeans and which had chartered the ocean freighter on the plaintiff's behalf. The defendant there argued that it could not be liable as a carrier because it did not issue the bills of lading. The court disagreed and held that non-signatories to a bill of lading may also be subject to liability as a carrier if there is some evidence connecting the party to the bill of lading. The court explained that the language of COGSA supports a broad definition of the term "carrier," which is consistent with the congressional purpose of alleviating a perceived imbalance of bargaining power between carriers and shippers.

Here, the trial court concluded that defendant was a carrier because it held itself out as a single point contact to ship the goods, it did in fact make all the arrangements for shipping the goods, and it knew plaintiff was relying on it in all respects for shipping the goods. While such conclusions might have been sufficient under *Joo Seng Hong Kong,* we conclude that two more recent cases must also be considered before defendant's status as a "carrier" may be determined.

In *Hyundai Corp. v. Hull Insurance Proceeds of M/V Vulca, supra,* the court formulated two tests for determining who is a carrier for purposes of COGSA: an "agency test" and a "practical test." The "agency test" focuses on the bill of lading, that is, who issued the bill of lading, who signed the bill of lading, whose form was used for the bill of lading, and, most importantly, who authorized the bill of lading. Under the "agency test," it is the shipowner or charterer who is most frequently held to be the carrier. In contrast, the "practical test" asks: (1) who was involved in the transportation of the cargo; and (2) who engaged in actions that ultimately caused damage to the cargo.

Even more recently, in *Hoffmann–La-Roche v. M/V TFL Jefferson, supra,* the court, while ultimately concluding the party was a freight forwarder and not a carrier, stated that in making that determination, courts should consider: (1) the manner in which the party's obligations are expressed in the contract; (2) the history of dealings between the parties; (3) the issuance of the bill of lading; and (4) how the party makes its profit. No one consideration is determinative and no one fact or factor is controlling with respect to any consideration.

While the trial court's findings and conclusions here are detailed, they are not sufficiently comprehensive as to permit an analysis which includes the considerations announced in *Hoffmann–LaRoche* or *Hyundai.* Accordingly, the matter must be remanded to the trial court for further findings with respect to defendant's status as a carrier under COGSA in light of *Hoffmann–LaRoche* and *Hyundai.*

## II.

As the issue may arise on remand, we address defendant's argument that the trial court erred in not giving effect to the limitation of liability terms on the reverse side of its invoice.

## A.

At the outset, we note that if the trial court on remand again determines that defendant is a carrier under COGSA, the provisions of COGSA supersede any terms in the contract and the limitations on damages contained in COGSA would apply.

COGSA, at 46 App.U.S.C. § 1303(8) (1994), provides as follows:

Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect.

While voiding contract provisions limiting liability, COGSA itself limits liability to $500 per package unless the nature and value of the goods are declared and noted in the bill of lading. 46 App.U.S.C. § 1304 (1994). The application of this limitation on liability has been restricted to those instances in which the shipper was given a fair opportunity to pay a greater charge for higher liability. *Nemeth v. General Steamship Corp.*, 694 F.2d 609 (9th Cir.1982).

### B.

The trial court, without reference to COGSA, concluded that the additional provisions on the reverse side of the invoice were not a part of the contract between the parties. We conclude there is support in the record for this conclusion.

■ An enforceable contract requires mutual assent to an exchange, between competent parties, with regard to a certain subject matter, for legal consideration. *Denver Truck Exchange v. Perryman*, 134 Colo. 586, 307 P.2d 805 (1957). An offer is a manifestation by one party of a willingness to enter into a bargain. Restatement (Second) of Contracts 24 (1979). An acceptance is a manifestation of assent to the terms of the offer and, unless otherwise specified in the offer, the offeree may accept by promising to perform or by performing. Restatement (Second) of Contracts 32 (1979).

■■ Without deciding that the additional provisions were unconscionable, the trial court considered the factors set forth in *Davis v. M.L.G. Corp.*, 712 P.2d 985 (Colo. 1986). The *Davis* factors mitigating against enforcement are: (1) a standardized agreement executed by parties of unequal bargaining strength; (2) the lack of opportunity to read and become familiar with the document before signing it; (3) the use of fine print in the portion of the contract containing the provision; and (4) the absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated. Also to be considered are: (1) the terms of the agreement, including substantive unfairness; (2) the relationship of the parties, including factors of assent, unfair surprise, and notice; and (3) all the circumstances surrounding the formation of the contract, including its commercial setting, purpose, and effect.

■ Several of these factors address the issue of whether there was ever any agreement as to the additional provisions. For instance, the trial court made extensive findings as to the extreme difficulty it had in reading the reverse side of the invoice. The trial court stated:

I must say and I find that I was very impressed this morning with [witness'] ability to read this invoice as he sat on the stand. His doing so evidenced very extremely keen eyesight or that he had memorized the provisions of the invoice and I think it was probably the former and not the latter.

. . . .

I have measured, physically, the document and find that there are 15 lines of print per an inch. To say this is fine print is an understatement. This is extremely fine print in a light shade of ink that makes it, for all practical purposes, susceptible to reading only if a person were to very cautiously and carefully progress through the material, were to transcribe it so that it could be typed in bolder print so that sentences could be read as sentences as compared to a group of words and so that a person might understand the continuity of what is there.

While there is a reference on the front of the invoice that there are terms and conditions on the reverse side, there is no reference in the correspondence which the trial court found constituted the contract to any additional express terms.

In addition, the trial court concluded that there was insufficient evidence to establish any agreement with respect to the additional terms by virtue of this or previous transactions. The record reveals, inter alia, that the invoice was sent at the end of the transaction, not the beginning; and neither of the plaintiff's principals was actually aware of any additional provisions from this or previous transactions. See *Surplus Electronics Corp. v. Gallin,* 653 P.2d 752 (Colo.App.1982) (holding that the fine print terms at the bottom of an invoice imposing attorney fees were not terms upon which the parties agreed and therefore did not become part of the contract).

Defendant relies upon *Independent Machinery, Inc. v. Kuehne & Nagel, Inc.,* 867 F.Supp. 752 (N.D.Ill.1994), in which the plaintiff was held to the liability provisions printed on the back of defendant's invoice because the plaintiff had received the invoice over five times in the past. That case is distinguishable, however, in that there the customer was prominently advised on both the shipping advice and the invoices that there were additional terms, and acknowledged it was actually aware of the additional provisions prior to the transaction.

We are not persuaded that plaintiff's consistent payment of defendant's invoices without objection to the liability provisions evidenced a course of dealing wherein plaintiff assented to those additional terms. See *Transwestern Pipeline Co. v. Monsanto Co.,* 46 Cal.App.4th 502, 53 Cal.Rptr.2d 887, 895 (1996) ("Common sense tells us the mere exchange of forms containing inconsistent terms, for however long a period, cannot establish a common understanding between the parties as to which set of conflicting terms is part of their contract."); *Maxon Corp. v. Tyler Pipe Industries, Inc.,* 497 N.E.2d 570, 575 (Ind.Ct.App.1986) (a reliance on the prior course of dealings between the parties was misplaced because "[a]n exchange of identical forms on prior occasions does not, of itself, establish a common basis of understanding.").

We conclude the trial court committed no error in concluding that the additional terms on the reverse side of defendant's invoice did not become terms of the agreement between the parties for the shipment of the insulation.

### III.

The defendant also argues that the trial court erred in applying the common law of deviation. We disagree.

■ The common law of deviation, if applicable, makes a carrier essentially an insurer of the cargo and allows the purchaser to avoid the limitations on liability contained in COGSA.

Liability under COGSA is limited to $500 per package unless the nature and value of the goods are declared and inserted in the bill of lading. 46 App.U.S.C. § 1304 (1994).

The impact of deviation (fundamental breach) on liability under COGSA is set out at 46 App.U.S.C. § 1304(4) (1994) as follows:

> Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: Provided however, That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.

Many courts interpreting this provision hold that COGSA does not alter the common law rule of deviation and that even the COGSA limits will not apply in cases where the carrier's conduct amounts to an unreasonable deviation from the carriage contract. *Yang Machine Tool Co. v. Sea–Land Service, Inc.,* 58 F.3d 1350 (9th Cir.1995); *C.A. Articulos Nacionales de Goma Gomaven v. M/V Aragua,* 756 F.2d 1156 (5th Cir.1985); *C.A. La Seguridad v. Delta Steamship Lines,* 721 F.2d 322 (11th Cir.1983); *Nemeth v. General Steamship Corp., supra; Jones v. Flying Clipper,* 116 F.Supp. 386 (S.D.N.Y.1953); but see *Sedco, Inc. v. S.S. Strathewe,* 800 F.2d 27 (2d Cir.1986) (the only deviations considered unreasonable such that they void COGSA liability limits are geographic deviation and unauthorized on-deck stowage); *Atlantic Mutual Insurance Co. v. Poseidon Schiffahrt,* 313 F.2d 872 (7th Cir.1963) (COGSA limits apply despite the carrier's unreasonable deviation).

Prior to enactment of COGSA, under the doctrine of deviation in maritime law, if the carrier deviated from the express terms of a contract for carriage, the contract was rescinded and the carrier assumed liability as an insurer. *Jones v. Flying Clipper, supra.*

The rule first applied to geographical departures from the agreed upon voyage. Over the years, however, it has been interpreted to include quasi-deviation—other conduct by a carrier that constitutes an unreasonable deviation. *Varian Associates v. Compagnie Generale Transatlantique,* 85 Cal.App.3d 369, 149 Cal.Rptr. 534 (1978).

An unreasonable deviation is more than mere negligence in the handling or stowage of cargo. It must be a serious departure from the contract that exposes the goods to unanticipated, additional risks. *Jones v. Flying Clipper, supra; Nemeth v. General Steamship Corp., supra;* see also T. Schoenbaum, Admiralty & Maritime Law 10–32 (2d ed.1997).

In its discussion of the common law of deviation, the trial court relied upon, and quoted extensively from, C. McCorkle, Annotation, *Deviation by Carrier in Transportation of Property,* 33 A.L.R.2d 145, 156 (1954), which stated:

> The term 'deviation,' as used in the law of carriers, particularly in respect of the carriage of property, has a technical meaning. It is of maritime origin, and was originally employed to express the wandering or straying of a vessel from the customary course of the voyage, but has been extended to include other modes of transportation and other departures from the contract of carriage. In its modern and present usage as descriptive of a specific doctrine or formula for determining the liability of a carrier under certain circumstances, it may be defined generally as a voluntary departure, without necessity or reasonable cause, from the customary, agreed, or most practicable route, means or manner of transportation, or from some other provision or requirement of the contract of carriage, whereby the property is subjected to a different risk of loss or injury from that to which it would other-

wise have been subjected, or the shipper is deprived of some incidental right or privilege which he would otherwise have enjoyed, or subjected to some additional expense in connection with the shipment.

. . . .

> Although it has been stated that, to constitute a deviation, the departure must have a tendency to increase the risk of loss or injury, the true doctrine seems to be that it is not essential that the risk be increased, and that it is sufficient if the departure tends to change or vary the risk, regardless of whether it is increased or lessened.

We are aware that some courts have narrowed the types of carrier conduct that constitute an unreasonable deviation, thus narrowing the exceptions to the COGSA $500 per package liability limit. *SPM Corp. v. M/V Ming Moon,* 965 F.2d 1297 (3d Cir.1992) (restowage of cargo at an intermediate port of call was customary in the trade and thus not unreasonable); *Sedco, Inc. v. S.S. Strathewe, supra* (negligence in failing to reload cargo, erroneously telling the shipper it was still on board, and later failing to locate the cargo, was not a deviation).

We are persuaded under the facts of this case, however, that defendant's conduct in departing from the specifically agreed upon term in the contract of carriage that the cargo be shipped in a dedicated container is sufficient to trigger application of the common law doctrine of deviation. See *Varian Associates v. Compagnie Generale Transatlantique, supra* (deviating from the agreed upon method of transportation constitutes an unreasonable deviation).

Therefore, in the instant case, the trial court properly applied the common law doctrine of deviation in holding that the COGSA liability limit of $500 per package does not apply, and defendant, if a carrier, is liable for the damage to the cargo, without fault.

## IV.

Defendant also argues the trial court erred in finding it failed to establish that inadequate packaging was the cause of the damage

to the goods. It is not clear whether defendant seeks the exemption from liability provided by 46 App.U.S.C. § 1304(2)(n)(1994) (insufficiency of packing) or seeks to prove that plaintiff is at fault for choosing the packing material. In light of our previous holdings, we disagree.

Here, neither party presented any direct evidence as to when, where, or how the goods were damaged. The trial court specifically concluded that neither party had proven the actual cause of the damage.

Defendant offered and relied upon a report prepared by an independent insurance surveyor concluding the damage was caused by the fact that the goods were packed in plastic wrapping and not in cardboard boxes or other more rigid containers. The trial court found, however, that the packaging was specifically chosen in reliance on a provision of the contract of carriage requiring that the goods be shipped door to door in a dedicated container.

In addition, the trial court found that the common law doctrine of deviation applied and that the carrier was therefore, in essence, an insurer of the cargo and liable regardless of the actual cause of the damage.

We conclude the trial court's findings in this regard are supported by the record. Hence, they will not be disturbed. See *Associates of San Lazaro v. San Lazaro Park Properties*, 864 P.2d 111 (Colo.1993).

## V.

Finally, defendant asks us to review the court's denial of its motions for summary judgment and for dismissal following the presentation of plaintiff's evidence. We decline to do so.

The denial of a motion for summary judgment is not an appealable final order. *Manuel v. Fort Collins Newspapers, Inc.*, 631 P.2d 1114 (Colo.1981).

Likewise, the denial of a motion to dismiss at the close of the plaintiff's evidence did not completely determine the rights of the parties and required further action by the court. Hence, it is not a final ruling subject to review. See *Stillings v. Davis*, 158 Colo. 308, 406 P.2d 337 (1965).

In light of our holding, we also do not address the plaintiff's contention on cross-appeal that defendant was liable as a bailee.

The cause is remanded for further findings with regard to whether defendant was a carrier for purposes of COGSA in accordance with the views herein expressed, and if defendant is found to be such, then the judgment shall stand affirmed, subject only to defendant's right to appeal that ruling. If defendant is found not to be a carrier, then the judgment is reversed, and a new trial ordered consistent with the views announced herein.

JONES and KAPELKE, JJ., concur.