I. Kaufman ARENBERG, M.D., F.A.C.S., a Colorado citizen, Plaintiff,

v.

CENTRAL UNITED LIFE INSURANCE COMPANY, a Texas corporation, Defendant.

No. CIV.A. 97–B–428.

United States District Court, D. Colorado.

Aug. 27, 1998.

Thomas L. Roberts, John B. Grow, Karen V. Reutzel, Roberts & Zboyan, P.C., Denver, CO, for Plaintiff.

C. Scott Crabtree, Stephen Fitzsimmons, Alexander & Crabtree, P.C., Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendant, Central United Life Insurance Company ("Central United"), moves for reconsideration and clarification of my July 16, 1998 order ("the July 16 order") granting plaintiff's motion for partial summary judgment and denying Central United's motion for summary judgment. Central United also requests certification of the July 16 order as final and appealable pursuant to Rule 54 and 28 U.S.C. § 1292(b) (1997). Plaintiff, I. Kaufman Arenberg, M.D., F.A.C.S. ("Dr.Arenberg"), opposes reconsideration and certification of the July 16 order. The motions are adequately briefed and oral argument will not aid materially their resolution. Jurisdiction exists pursuant to 28 U.S.C. § 1332. After review of the parties' briefs and applicable law, I grant Central United's motion to reconsider and vacate the July 16 order. I also deny, as moot, Central United's request to certify the July 16 order as appealable. In this order, which supersedes the July 16

order, I deny Dr. Arenberg's motion for summary judgment and grant, in part, and deny, in part, Central United's motion for summary judgment.

## I. FACTS

The following material facts are undisputed. Dr. Arenberg was an employee and sole shareholder of The Ear Center, a professional corporation that specialized in otologic and neurotologic surgery, also referred to as "microsurgery." The record does not indicate whether Dr. Arenberg was also an officer of The Ear Center.

Dr. Arenberg purchased an "Injury and Sickness Income Replacement Policy" ("the policy") from Prairie States Life Insurance Company (Prairie States) on October 28, 1982. Life of America Insurance Company (Life of America) succeeded Prairie States as the policy insurer in 1988. Central United assumed all legal obligations of both Prairie States and Life of America in 1994, thereby becoming the policy insurer.

On January 24, 1995, while the policy was in force, Dr. Arenberg sent a letter to Central United that states:

Please cancel my Disability Insurance Policy # 3604501489 effective 2/1/95. Also, please cancel my automatic withdrawal on a monthly basis of $431.60.

(Ltr. from Dr. Arenberg to Life of America of 1/24/95, Plf.'s Ex. C.) Central United received this letter on January 30, 1995. (Def.'s Answer to Plf.'s Disc. Requests ¶ 18(d), Plf.'s Ex. V; Answer ¶ 52.) Central United's policyholder service department processed this letter and entered it into its computer system on February 2, 1995. Also on February 2, 1995, Central United's bank account was credited $431.60 via automatic funds transfer. This payment represents Dr. Arenberg's February premium payment. Central United retained the February premium payment and did not respond to Dr. Arenberg's letter dated January 24, 1994. (Stip. ¶ 8, Pretrial Ord. of 3/10/98 at 10; Answer ¶ 54.)

On February 7, 1995, Dr. Arenberg was told he suffered a stoke in December 1994, an event that constitutes a "Covered Injury" or "Covered Sickness" as defined by the policy. (Ltr. from Dr. O'Brien to Dr. Higgins of 2/7/95, Plf.'s Ex. F.) A magnetic resonance imaging test confirmed this diagnosis and, on February 20, 1995, Dr. Arenberg's neurologist wrote:

As you know, there are some continuing problems with fine motor dexterity in the right hand. As [Dr. Arenberg] is left-hand-dominant, this has not been incapacitating, although is clearly affecting his function with microsurgery. I have recommended that he begin a course of occupational therapy, specifically with fine motor dexterity exercises for the right hand. In general, after motor-lacunar strokes, there is a period of improvement over 3–6 months, and then things tend to level off. We should be able to see if there are further gains possible, with approximately a 50% chance of being able to continue microsurgery.

(Ltr. from Dr. O'Brien to Dr. Higgins of 2/20/95, Plf.'s Ex. G.) Also on February 20, 1995, Dr. Arenberg signed a letter, which states:

In error I previously sent a letter dated 1/24/95. I do not wish to cancel the Disability Insurance Policy # 3604501849, just the previous method of payment by automatic withdrawal. I have enclosed check # 2306 in the amount of $431.60 for my February premium and will continue to send this premium amount on a monthly basis.

(Ltr. from Dr. Arenberg to Life of America of 2/20/95, Def.'s Ex. 2.) Dr. Arenberg, however, never sent this letter to Central United.

The very next day, on February 21, 1995, Dr. Arenberg canceled all of his upcoming, scheduled surgeries and discontinued his practice of microsurgery. He has not performed microsurgery since. (Aff. of Dr. Arenberg ¶ 8, Plf.'s Ex. A.) He continued to see patients through November 1996 and the Ear Center closed in December 1996. (Aff. of Dr. Arenberg ¶ 9, Plf.'s Ex. A; Ltr. from Dr. Arenberg to patients The Ear Center of 11/4/96, Plf.'s Ex. I.) On March 16, Central United received a letter from Dr. Arenberg dated March 10, 1995, which states:

Enclosed is check # 2306 in the amount of $431.60 for my March premium. I will continue to send this premium amount on a monthly basis rather that [sic] automated withdrawal from my checking account. Thank you for your help in this matter and please start sending me monthly statements for me to process my monthly payment by check.

(Ltr. from Dr. Arenberg to Life of America of 3/10/95, Plf.'s Ex. S.) By letter dated March 16, 1995, Central United returned check number 2306 to Dr. Arenberg:

Enclosed you will find your check number 2306, in the amount of $431.60, recently submitted for premium payment on the above referenced policy.

We are returning this payment to you as coverage provided by the policy has been canceled effective February 28, 1995, the date to which premiums were paid at the time we received your cancellation request, dated January 24, 1995. Enclosed for your reference is a copy of your letter requesting cancellation of coverage.

(Ltr. from Central United to Dr. Arenberg of 3/16/95, Plf.'s Ex. T.)

On May 22, 1995, Central United received Dr. Arenberg's proof of claim. (Stip. ¶ 12, Pretrial Ord. of 3/10/98 at 10.) By letter dated July 13, 1995, Central United requested additional information in support of his claim. Dr. Arenberg supplied additional information. After a period of correspondence, Central United issued a denial letter to Dr. Arenberg's counsel dated October 16, 1995, which letter provides:

We have reviewed Dr. Arenberg's disability claim for which he submitted a claim form dated May 15, 1995, and have concluded that the subject Injury and Sickness Income Replacement policy does not provide coverage to him inasmuch as his covered sickness did not manifest itself until one (1) week before the policy was canceled. Therefore, the insured's net income had not yet dropped.

Enclosed please find a copy of Dr. Arenberg's January 24, 1995 letter in which he requested that his disability policy be canceled effective February 1, 1995. Because premiums had already been paid to Febru-

ary 28, 1995, on the date we received the notice of cancellation, the policy was canceled effective February 28, 1995.

A "covered loss" exists when in any calendar month the Insured's net income is less than eighty percent of base earnings solely as a result of a Covered Injury or Covered Sickness.

According to Dr. Christopher's February 7, 1995 report, Dr. Arenberg "has had no problems carrying out his job ..." It was not until March 1, 1995 that Dr. Higgins communicated to Dr. Arenberg that he could no longer practice as a surgeon.

The financial records provided to us by your client show that his net income was never less than 80% of his base earnings, therefore, he is not entitled to benefits under the policy. The medical records provided by your client show that the covered sickness did not affect Dr. Arenberg's income until after our policy was canceled.

(Ltr. from Mary Lou Rainey to Thomas Roberts of 10/16/95 (strikeout in original), Def.'s Ex. 4.) Dr. Arenberg commenced this action on March 3, 1997. He filed an amended complaint on June 3, 1997, which states four claims: (1) breach of contract; (2) violation of public policy; (3) estoppel/waiver; and (4) breach of implied covenant of good faith and fair dealing.

## II. SUMMARY JUDGMENT STANDARDS

Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The non-moving party has the burden of showing that issues of undetermined material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that it believes demon-

strate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir.1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence present in the motion and response. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106· S.Ct. 1348, 89 L.Ed.2d 538 (1986). The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505; *Mares*, 971 F.2d at 494. Although on a cross motion for summary judgment I assume no evidence need be considered other than that submitted by the parties, summary judgment is inappropriate if disputes remain as to material facts. *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir.1997) (citing *Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir.1981)).

### III. ANALYSIS OF CROSS–MOTIONS FOR SUMMARY JUDGMENT

Central United moves for summary judgment regarding each of Dr. Arenberg's claims. Dr. Arenberg moves for partial summary judgment as to his breach of contract

claim. In this diversity action, resolution of the pending motions turns on Colorado law. The parties do not argue otherwise. I address each claim separately.

#### a. Breach of Contract

■ Colorado courts construe insurance contracts by applying the rules of construction applicable to general contracts. *City of Northglenn v. Chevron U.S.A., Inc.*, 634 F.Supp. 217, 222 (D.Colo.1986). The elements for a breach of contract claim in Colorado are: (1) existence of a contract; (2) performance by plaintiff or some justification for nonperformance; (3) failure to perform the contract by defendant; and (4) damages to plaintiff. *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo.1992).

##### 1. Existence of Contract; Performance by Dr. Arenberg; Failure to Perform by Central United

The parties stipulate the insurance policy document controls their legal relationship. (Stip. ¶ 17, Pretrial Ord. of 3/10/98 at 11.) The policy's data page, which represents the customized portion of the policy and is referred to throughout the policy, states, in relevant part:

| | |
|---|---|
| Date of Issue: | 10–28–82 |
| | Basis for Policy years and months |
| Name of Insured: | Irving K. Arenberg |
| Age at Issue: | 42 |
| * * * * * * | |
| Owner: | Insured |
| Elimination Period: | 90 days |
| Maximum Monthly Benefit: | $7,030.00 |
| Benefit Period: | To age 65 for covered loss beginning before policy anniversary nearest age 63. 2 years for covered loss beginning after policy anniversary nearest age 63. |
| Total Annual Premium at Date of Issue: | $4,843.42 |

(Insurance Policy at 2, Plf.'s Ex. B.) Although the parties do not dispute that an insurance contract exists, the issue whether the contract was terminated by Dr. Arenberg's January 24 letter is vigorously contested. The first issue requiring resolution, therefore, is the legal effect of Dr. Arenberg's January 24, 1995 cancellation letter.

As noted above, the January 24 letter requested cancellation of the policy effective February 1, 1995. Central United received the letter on January 30, 1995 but did not "process" the letter until February 2, 1995. Also on February 2, 1995, the February premium was automatically credited to Central United's account via wire transfer. Central United did not reply to Dr. Arenberg's cancellation letter. Rather, Central United unilaterally chose to treat the cancellation effective as of February 28, 1995, but did not communicate this fact to Dr. Arenberg until mid-March.

█ Under Colorado law, an insurance policy may be canceled only by compliance with the terms of the policy, by operation of law, or by mutual agreement of the parties to the policy. *Omni Development Corp. v. Atlas Assur. Co. of America,* 956 P.2d 665, 668 (Colo.App.1998); *Hill v. Capitol Life Ins. Co.,* 91 Colo. 300, 303, 14 P.2d 1006, 1007 (1932). *See also Markel v. Travelers Ins. Co.,* 510 F.2d 1202, 1207 (10th Cir.1975) (identifying rule as emanating from "general" common law); 2 COUCH ON INSURANCE § 30:1 (3d ed.1996); 43 AM. JUR.2d INSURANCE §§ 415–419 (1982 & Supp.1997). "In the absence of such authority, the general rule is that neither the insurer nor the insured has any right to rescind, cancel, surrender, or abandon a contract of insurance." COUCH, *supra,* at § 30:1 (footnote omitted). Central United argues that this rule of law leads to an absurd result, (Def.'s Mot. to Reconsider at 9), but cites no legal authority in support of its argument. As I am bound to follow Colorado law in this diversity case, I reject Central United's plea to apply a different rule.

Neither Dr. Arenberg nor Central United contend that the policy terminated by operation of law. Neither party relies on a statute or regulation as effecting termination. Thus, termination could have occurred only by compliance with the policy terms or by mutual consent.

### i. Cancellation by Compliance with Policy Terms

█ The policy contains only two relevant provisions regarding cancellation. First, the policy restricts the right of the insurer to cancel the policy:

### RENEWAL PROVISION

#### Non–Cancelable and Guaranteed Renewable to Age 65

The Owner has the right to keep this policy in force until the anniversary nearest the Insured's sixty-fifth birthday by paying the premiums shown on the Data Page. While this policy is in force during this period, [the Insurer] can not [sic]:

 a) cancel it as long as premiums are paid before the end of the Grace Period;

 b) refuse to renew it;

 c) add a restrictive rider;

 d) raise premiums over those shown on the Data Page;

 e) reduce the benefits.

(Insurance Policy at 1, Plf.'s Ex. B.) Second, the policy imposes on the insured certain requirements for payment of premiums which, if not followed, may lead to "lapse:"

Premiums are as shown on the Data Page and must be paid in advance. Premiums may be paid at the Home Office or to an agent named to collect them. The first premium is due on the date of issue. Except as provided elsewhere in this policy, no premium payment will keep the policy in force beyond the next premium due date.

\* \* \* \* \* \*

GRACE PERIOD. Each premium after the first one must be paid on the due date. [The Insurer] will accept payment up to thirty one days late. During this thirty one day Grace Period the policy will stay in force.

REINSTATEMENT. This policy will lapse if any premium is not paid when due. Lapse means that the policy is no longer in force. If [the Insurer] later accepts this premium but does not require an application, this will reinstate the policy. If an

application is required, the policy shall be reinstated on its approval by [the Insurer]. (Insurance Policy at 4, Plf.'s Ex. B.)

After reviewing the undisputed facts, I conclude that neither Dr. Arenberg nor Central United canceled the policy in accordance with the policy terms. Dr. Arenberg never failed to tender a premium payment within the grace period. His banking agent paid the February premium via wire transfer on February 2, 1995. He tendered, but Central United refused to accept, the March premium on March 16, 1995., Accordingly, the non-cancellation clause prohibited Central United from unilaterally canceling the policy. *See, generally,* COUCH, *supra,* at § 30:15 (discussing effect of non-cancellation clauses). Lastly, the policy terms do not expressly permit Central United to unilaterally cancel the policy.

### ii. Cancellation by Mutual Agreement

The parties to an insurance contract may cancel the contract by mutual agreement even though no such right is expressly reserved in the contract, provided the rights of third parties are not injured thereby. *Markel,* 510 F.2d at 1207; *Omni Development Corp.,* 956 P.2d at 668; COUCH, *supra,* at § 31:47. When cancellation is predicated upon the mutual consent of the insured and the insurer, they need not comply with the cancellation procedures expressed in the policy. *Id.* at §§ 31:47 and 31:51. "As the mutual agreement by which the policy is canceled ... is contractual in nature, it follows that the elements of a contract must be present in order to give rise to a termination by mutual agreement. Thus, there must be a mutual consent as found in the offer of terms and their acceptance by the other party, and each party must act with knowledge of the material facts." *Id.* at § 31:58 (footnotes omitted) (collecting cases).

Under Colorado law, the existence of an expressed or implied contract depends on words or conduct that evidence a mutual intention to contract. *Haberl v. Bigelow,* 855 P.2d 1368, 1374 (Colo.1993); *DCB Construction Co., Inc. v. Central City Development Co.,* 940 P.2d 958, 961 (Colo.App.1996). To

establish the existence of a contract, the parties thereto must agree on all essential elements. *Federal Lumber Co. v. Wheeler,* 643 P.2d 31, 36 (Colo.1981). Although the issue whether a contract exists is generally a question of fact for the jury's determination, this is only true when "the evidence is conflicting or admits of more than one inference." *I.M.A., Inc. v. Rocky Mountain Airways, Inc.,* 713 P.2d 882, 887 (Colo.1986).

An offer is a manifestation by one party of a willingness to enter into a bargain. RESTATEMENT (SECOND) OF CONTRACTS § 24 (1979). An acceptance is a manifestation of assent to the terms of the offer. *Id.* at § 32. If the offeree accepts by promising to perform, courts generally hold that a "bilateral" contract exists in which the consideration of the promise of one party is a promise on the part of the other party. If the offeree accepts by performance, a "unilateral" contract exists, defined as a contract in which there is a promise on one side only, the consideration therefor being an act. 17A AM. JUR.2D CONTRACTS § 5 (1991 & Supp.1997). "Offers to enter into either bilateral or unilateral contracts may not be revoked after acceptance." *Sigrist v. Century 21 Corp.,* 519 P.2d 362, 363 (Colo.App.1973).

In the case of an offer to enter into a bilateral contract (an offer that requests a promise to perform instead of performance), the offeree's acceptance must be of the identical terms of the offer and in the manner specified in the offer, without any changes. *Nucla Sanitation Dist. v. Rippy,* 140 Colo. 444, 448, 344 P.2d 976, 979 (1959); *Goodwin v. Eller,* 127 Colo. 529, 258 P.2d 493, 496 (1953). If the acceptance modifies the proposition in any particular, it amounts to nothing more than a counter-proposal and is not an acceptance which will complete the contract. *Nucla, supra.*

In the case of an offer to enter into a unilateral contract (an offer which requests return performance rather than a promise to perform), the offer is accepted when "substantial performance" has been rendered by the offeree. *Stortroen v. Beneficial Finance Co. of Colorado,* 736 P.2d 391, 399 (Colo. 1987); *Sigrist,* 519 P.2d at 363. "Substantial

performance" occurs when, "although the conditions of the contract have been deviated from in trifling particulars not materially detracting from the benefit the other party would derive from a literal performance, [the offeror] has received substantially the benefit he expected, and is, therefore, bound . . . ." *Diodosio*, 841 P.2d at 1058 (citation omitted). The Restatement provides: "In case of doubt an offer is interpreted as inviting the offeree to accept either by promising to perform what the offer requests or by rendering the performance, as the offeree chooses." RE-STATEMENT (SECOND) OF CONTRACTS § 32 (1979). *See also Industrial Products Int'l, Inc. v. Emo Trans, Inc.*, 962 P.2d 983, 987–88 (Colo.App.1997) (adopting Restatement § 32), *cert. filed*, 98SC0056 (Feb. 2, 1998).

█ Dr. Arenberg's January 24, 1995 letter states, in its entirety:

> Please cancel my Disability Insurance Policy # 3604501489 effective 2/1/95. Also, please cancel my automatic withdrawal on a monthly basis of $431.60.

(Ltr. from Dr. Arenberg to Life of America of 1/24/95, Plf.'s Ex. C.) Central United received the January 24 letter on January 30, 1995. (Def.'s Answer to Plf.'s Disc. Requests ¶ 18(d), Plf.'s Ex. V; Answer ¶ 52.) The January 24 letter clearly manifested Dr. Arenberg's intent to cancel the policy "effective 2/1/95" and therefore, was definite, clear, and unequivocal.

Central United argues that the terms of the letter are equivocal, noting that the policy "ran from the 28th of the month to the 28th of the following month" and does not envision a per diem basis of insurance. (Def.'s Mot. to Reconsider at 7.) I find Central United's arguments on this point unpersuasive. The January 24 letter constituted an offer to cancel the policy by Dr. Arenberg. In creating such offer, Dr. Arenberg was free to propose any terms of cancellation that he desired. In fact, Dr. Arenberg could have proposed retroactive cancellation to January 1, 1995, if he so chose. No doctrine of common law or policy language precluded Dr. Arenberg from choosing February 1, 1995 as the proposed date of cancellation. As noted by Central United's own insurance expert, Central United could have canceled the poli-

cy effective February 1, 1995 and issued a *pro rata* premium refund retroactive to 12:01 a.m. on January 28, 1995. (Depo. of Johnson at 81–82, Plf.'s Ex. A to Resp. to Def.'s Mot. Reconsider.) Accordingly, the monthly policy period cannot be read into the January 24 letter to make the letter ambiguous. A plain reading of the two-sentence letter compels the conclusion that Dr. Arenberg unequivocally requested cancellation of the policy effective February 1, 1995.

Central United also contends that, as a matter of law, the January 24 letter constituted an offer of unilateral contract. Because the January 24 letter does not specify the manner of acceptance, I am unwilling to find that, as a matter of law, the letter constituted an offer of unilateral contract. Restatement § 32, as adopted by the Colorado Court of Appeals in *Industrial Products*, simply does not permit such a finding. Because Dr. Arenberg's January 24 letter did not specify otherwise, Central United was free to accept his offer by promising to cancel the policy effective February 1, 1995, or rendering substantial performance. *Industrial Products Int'l*, 962 P.2d at 987–88; RE-STATEMENT (SECOND) OF CONTRACTS § 32. *Cf.* 17A AM. JUR.2D CONTRACTS § 5 (discussing former Restatement § 31).

█ It is undisputed that Central United did not accept by promising to perform. (Stip. ¶ 8, Pretrial Ord. of 3/10/98 at 10; Answer ¶ 54.) A representative of Central United testified as follows:

> Q. So Dr. Arenberg asked Central United to cancel the policy effective February 1, 1995.
>
> A. He did.
>
> Q. Central United didn't do that, though. Right?
>
> A. Central United canceled the policy. The effective date was different because of how he paid it.
>
> Q. How did he pay it?
>
> A. He—As you saw earlier, he paid it with an automatic bank draft. And by the time this letter was received at the company, the money had already gone through. So the compa-

ny policy is not to prorate the refund, so we just extended coverage until the 28th of February.

Q. Did you tell Dr. Arenberg that?

A. No.

(Depo. of Mary Lou Rainey at 25, Plf.'s Ex. E; *see also* Ltr. from Rainey to Roberts of 3/16/95, Plf.'s Ex. T.) The uncontroverted evidence shows that Central United's service department processed the January 24 letter and entered it into its computer system on February 2, 1995. Also on February 2, 1995, Central United's bank account was credited $431.60 via automatic funds transfer, representing Dr. Arenberg's February premium payment. Central United retained the February premium payment and deemed the insurance policy canceled effective February 28, 1995. Because Central United attempted to accept Dr. Arenberg's offer of cancellation by performing instead of promising to perform, Central United's acceptance must equate to "substantial performance." *Stortroen,* 736 P.2d at 399.

Central United argues that its "implementation" of Dr. Arenberg's January 24 letter constituted acceptance by substantial performance. As noted above, "substantial performance" occurs when, "although the conditions of the contract have been deviated from in trifling particulars not materially detracting from the benefit the other party would derive from a literal performance, [the offeror] has received substantially the benefit he expected, and is, therefore, bound ...." *Diodosio,* 841 P.2d at 1058 (citation omitted). The date on which an insurance policy terminates is, of course, an important issue. The bargained-for exchange sought by Dr. Arenberg was cancellation on February 1, 1995, not cancellation on February 28, 1995 plus payment of an additional premium.

Central United, however, argues its cancellation of the insurance policy effective February 28, 1995 and retention of the February premium payment did not materially detract from the benefit Dr. Arenberg would have derived from literal performance. Central United offers evidence indicating that the February 1, 1995 date was not important to Dr. Arenberg. On September 28, 1994, Dr. Arenberg prepared a letter offering to cancel the insurance policy effective October 1, 1994, but he never sent this letter to Central United. (Ltr. from Dr. Arenberg to Life of America of 9/28/94, Def.'s Ex. 8.) Dr. Arenberg also testified as follows during his deposition:

Q. Okay. Let's go back to Exhibit 45. You wrote, "Please cancel my Disability Insurance Policy Number 3604501489 effective 2/1/95," period. Let me ask this. Why February 1, 1995?

Dr. Arenberg. That was the next date, I guess.

Q. The next date of what?

Dr. Arenberg. That was a week away.

Q. Is that why you wanted it done February 1 of '95?

Dr. Arenberg. We wanted it done on that date. I think Dan [Arenberg] had a legal reason, but I don't know what it was. He specifically requested the date so it wasn't open ended. It was either cancel it on February 1st, '95, or don't cancel it.

Q. Did you say Dan [Arenberg] had a legal reason for that date?

Dr. Arenberg. I think he had a reason to specify a specific date so it was not left open-ended.

Q. Did he—

Dr. Arenberg. It was either cancel it on February 1st, '95, or—it wasn't an open-ended request that you could do it anytime. It was either February 1st or not at all.

Q. Do you remember this discussion with him?

Dr. Arenberg. No. I'm speculating.

Q. This is a sheer guess on your part about such a communication, then?

Dr. Arenberg. Well, it may be related to some fact at some point. But at the time, remember, this is still when I had this significant cerebral edema. So I'm not sure. I'm trying to help give you some idea of what I think, but I can't tell you.

Q. I don't want you guessing or speculating. I'm asking you if you know now why you caused this letter to say you wanted it effective February 1, 1995?

Dr. Arenberg. I don't know.

Q. Okay. Apparently, though, it sounds as if Dan was involved in helping prepare this letter; is that right?

Dr. Arenberg. Yes. I didn't prepare it.

(Depo. of Dr. Arenberg at 196–197 (objections omitted), Def.'s Ex. 10.) Additionally, on January 20, 1995, Dan Arenberg, Dr. Arenberg's son and business consultant, wrote a note to Cindy Wallace, Dr. Arenberg's office manager, stating: "OK to cancel Life of America Disability policy." (Memo. from Dan Arenberg to Cindy Wallace of 1/20/95, Def.'s Ex. 9.) The note does not reference any date of termination.

Whether there has been substantial performance is a question of fact for the jury except where the facts are undisputed and only one inference can be drawn reasonably. *Little Thompson Water Ass'n v. Strawn,* 171 Colo. 295, 466 P.2d 915, 917 (Colo.1970). *See also Rocky Mountain Airways,* 713 P.2d at 887 (whether a contract exists is generally a question of fact for the jury's determination when "the evidence is conflicting or admits of more than one inference"); *Morath v. Perkins,* 86 Colo. 101, 102, 278 P. 611, 611 (1929). I am also mindful of the summary judgment legal standards that apply to cross motions for summary judgment. As noted above, summary judgment should not enter if disputes remain as to material facts. *James Barlow Family Ltd. Partnership,* 132 F.3d at 1319. I hold genuine issues of material fact remain as to whether Central United's performance constituted "substantial performance."

A genuine issue of material fact also exists as to when Dr. Arenberg first suffered a "covered loss." The salient benefit provision of the policy states:

MONTHLY BENEFIT. When the Insured has a Covered Loss while this policy is in force, [the Insurer] will pay a monthly benefit which is eighty percent of the Insured's Base Earnings less the Insured's Net Income for such month. The payments will begin after the end of the Elimination Period stated on the Data Page. The benefit paid will not be more than the Maximum Monthly Benefit shown on the Data Page. The Insured will be required to and must present proof of Gross Income and Business Expense in writing as required by [the Insurer].

(Insurance Policy at 4, Plf.'s Ex. B.) It is undisputed that Dr. Arenberg's stroke constitutes a "covered injury" or "covered sickness." (Answer ¶ 38; Depo. of Mary Lewis at 35, Plf.'s Ex. H.) Yet in order to receive a "monthly benefit," Dr. Arenberg must have also suffered a "covered loss" while the policy was in force. (Insurance Policy at 4, Plf.'s Ex. B.) A "covered loss" exists "when in any .calendar month the Insured's net income is less than eighty percent of Base Earnings solely as a result of a Covered Injury or Covered Sickness." (Insurance Policy at 4 (emphasis added), Plf.'s Ex. B.) The parties thoroughly address in their briefs the issue whether Dr. Arenberg first suffered a "covered loss" in February or March 1995. Central United argues that Dr. Arenberg did not actually suffer a covered loss until March 1995. Dr. Arenberg contends that he suffered a covered loss in February 1995.

The Ear Center paid Dr. Arenberg's salary based on a fourteen-day pay period. (Pay Stubs, Plf.'s Ex. K.) For each of 26 of 27 pay periods in 1994, he received a salary payment of $7,500 five days after the close of each fourteen-day pay period. (Aff. of Wallace ¶ 4, Plf.'s Ex. J; Pay Stubs, Plf.'s Ex. K.) Dr. Arenberg received total compensation of $257,100 in 1994, including a $52,100 bonus. (1994 Yearly Profit & Loss Statement of The Ear Center at 3, Plf.'s Ex. L; Dr. Arenberg's 1994 Individual Tax Return, Plf.'s Ex. M.) For each of the three fourteen-day pay periods from December 23, 1994 to February 2, 1995, Dr. Arenberg received $7,500. (Pay Stubs, Plf.'s Ex. K at 10.) For the pay period beginning February 2 and ending February 16, 1995, Dr. Arenberg again received $7,500. (Pay Stub for Check # 2156 issued 2/21/95, Plf.'s Ex. K at 11.) What happened thereafter is disputed.

Central United submits evidence indicating that Dr. Arenberg continued to receive $7,500 for the pay period beginning February 17, 1995 and ending March 3, 1995. (February 1995 Profit & Loss Statement of The Ear Center ("SALARY—DR. ARENBERG 15,-000.00"), Def.'s Ex. 12 at 2.) Cindy Wallace, bookkeeper for The Ear Center, also identified a transaction report as containing her handwriting, which states that Dr. Arenberg's income did not decrease until March

1995. (January 1995 Profit & Loss Statement of The Ear Center (with handwritten notations), Def.'s Ex. 14.) Based on this evidence, Central United alleges that not until March 1995 was Dr. Arenberg's net income less than 80% of his base earnings solely as a result of a covered injury or sickness.

Dr. Arenberg submits contradictory evidence indicating he received only $1,500 for the pay period beginning February 17, 1995 and ending March 3, 1995. (Pay Stub for Check # 2179 issued 3/7/95, Plf.'s Ex. K at 11.) Dr. Arenberg maintains that, after Dr. O'Brien confirmed his earlier diagnosis of stroke on February 20, 1995, Dr. Arenberg reduced his salary from $7,500 per pay period to $1,500 per pay period, retroactive to February 17, 1995. Based on this inconsistent evidence, Central United alleges that Dr. Arenberg's salary decrease was timed to qualify him for policy benefits and, therefore, the reduction in his net income was not caused "solely" as a result of a covered injury or sickness.

I conclude that genuine issues of material fact exists regarding the timing of Dr. Arenberg's net income reduction and whether such reduction was caused "solely" by a covered loss. Some of the documents support Dr. Arenberg's claim that his net income was below the threshold level in February 1995 solely because of his stroke. Other documents indicate his salary did not decrease until March 1995, and then only because of an administrative decision. Each interpretation is reasonable.

In summary, genuine issues of fact exist regarding three key issues: (1) whether Central United accepted Dr. Arenberg's January 24 cancellation offer by rendering substantial performance; (2) when Dr. Arenberg suffered a "covered loss;" and (3) whether Dr. Arenberg's income reduction was caused "solely" by a covered injury or illness. Accordingly, neither Dr. Arenberg nor Central United is entitled to summary judgment on the breach of contract claim.

### 2. Damages

Assuming that he will prevail on the first three elements of his breach of contract claim, Dr. Arenberg moves for summary judgment on the issue of damages for breach. He argues that he is entitled to acceleration of all future benefits potentially due under the policy through January 10, 2006, his sixty-fifth birthday. (Plf.'s Brf. in Supp. of Mot. Summ. J. at 17–18.) In support of acceleration, Dr. Arenberg does not rely on any policy language. Rather, he cites three cases: *Group Life & Health Ins. Co. v. Turner,* 620 S.W.2d 670, 674 (Tex.App.1981), *Lone Star Life Ins. Co. v. Griffin,* 574 S.W.2d 576, 579 (Tex.App.1978), and *Prudence Life Ins. Co. v. Morgan,* 138 Ind.App. 287, 213 N.E.2d 900, 911 (Ind.App.1966). According to Dr. Arenberg, these cases stand for the proposition that an innocent party to a contract of insurance payable over time need not be held hostage by a continuing contractual relationship with a party that has repudiated the contract and, therefore, uncertainties as to future entitlement under the contract are borne by the repudiating party.

My review of these cases, however, indicates Dr. Arenberg overstates the importance of their holdings. For instance, *Group Life* held that evidence in the record supported the trial court's award of lump-sum damages for breach of an insurance contract. *Group Life,* 620 S.W.2d at 674 (noting that the amount of the monthly installments due under the contract, the sum of past installments paid, the sum of installments paid into the registry of the court, the insured's age, and the extent and duration of the insured's disability were undisputed). *Lone Star,* at least on the page cited by Dr. Arenberg, merely discusses repudiation and has no particular relevance to this case. Only *Morgan* discusses an insured's right "to pursue his remedy for damages for the breach and to recover, once for all, in a single suit all that may ultimately be due him." *Morgan, supra* (noting that this legal principle of contracts is followed by the courts of Kentucky and Indiana) (internal quote and citation omitted). Colorado law applies, however, in this diversity case. The issue whether Dr. Arenberg has the right, under Colorado law, to acceleration of all future benefits he would receive under the policy is unclear. Neither Dr. Arenberg nor Central United have ade-

quately briefed this issue and I will not resolve it at this juncture. Accordingly, Dr. Arenberg is not entitled to judgment as a matter of law on the issue of damages for breach of contract.

### b. Violation of Public Policy

Central United moves for summary judgment regarding Dr. Arenberg's second claim, "violation of public policy." In this claim, Dr. Arenberg alleges that Central United's original basis for denial of his claim for benefits prevents even a "theoretical possibility of an insured having any coverage for a loss that occurs during the last 90 days of the policy, and Dr. Arenberg could not have received any insurance coverage in exchange for his January or February 1995 premium payments." (Am.Compl.¶ 47.) Dr. Arenberg seeks damages and severance from the policy any provision that violates public policy. (Am.Compl.¶ 50.) It would appear, therefore, that Dr. Arenberg's second claim, entitled "violation of public policy," actually seeks partial rescission of the policy, discussed as follows:

> While a contract of insurance which is entire and indivisible is not susceptible of rescission in part, the rescission of a separable or divisible part of the contract may be declared, leaving the balance of the contract in force, where the contract of insurance is divisible and the facts of the case warrant such relief, provided the ground for rescission does not affect the entire contract. When the ground is incapacity of the insured, fraud which relates to the entire contract, or something else that affects the entire contract, partial rescission would leave an inherent defect in the remaining portion of the contract, making rescission of the entire contract the practical solution.

COUCH, *supra*, at § 31:69 (footnotes omitted). The genesis of Dr. Arenberg's partial rescission claim is his concern that, even if he prevails on the first and second elements of his breach of contract claim (existence of a contract and performance by Dr. Arenberg), the contract will be interpreted as preventing him from recovering benefits for a covered loss that occurs during the last ninety days of the policy. Indeed, Central United advocates such an interpretation of the policy. (Def.'s Mot. Summ. J. at 17.) Thus, Dr. Arenberg essentially requests partial rescission of those aspects of the policy that compel such an interpretation, if any.

■■■■ Colorado courts construe insurance contracts by applying the rules of construction applicable to general contracts. *City of Northglenn v. Chevron U.S.A., Inc.,* 634 F.Supp. 217, 222 (D.Colo.1986). Whether ambiguity exists in a contract is a matter of law for the court to determine. *K N Energy, Inc. v. Great Western Sugar Co.,* 698 P.2d 769, 776 (Colo.1985). Ambiguity exists when "a contract provision is reasonably and fairly susceptible of more than one meaning." *Geralnes B.V. v. City of Greenwood Village, Colorado,* 583 F.Supp. 830, 838 (D.Colo.1984) (citing *Union Rural Elec. Ass'n Inc. v. Public Utilities Comm'n of State,* 661 P.2d 247, 251 (Colo.1983)). To ascertain whether contractual provisions are ambiguous, "the language used therein must be examined and construed in harmony with the plain and generally accepted meaning of the words employed and by reference to all the parts and provisions of the agreement and the nature of the transaction which forms its subject matter." *Cheyenne Mountain School Dist. No. 12 v. Thompson,* 861 P.2d 711, 715 (Colo. 1993).

■■■■ In determining whether a contract is ambiguous, the court may conditionally admit extrinsic evidence on this issue. *See Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310, 1314 n. 3 (Colo.1984) (citing 4 S. Williston, A TREATISE ON THE LAW OF CONTRACTS § 601, at 311 (W. Jaeger ed.1961)). If the court, after considering the extrinsic evidence, determines that there is no ambiguity, then the extrinsic evidence must be stricken. *Id.* Extrinsic evidence conditionally admissible constitutes evidence that bears upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract. *K N Energy,* 698 P.2d at 777. I may not consider, however, the parties' own extrinsic expression of intent. *Id.*

██ Normally, the interpretation of an ambiguous contract is an issue for the trier of fact to decide in the same manner as other disputed factual issues. *Cheyenne Mountain* at 715. Colorado law, however, treats insurance contracts differently than other contracts. Colorado courts consistently construe ambiguous terms in an insurance contract in favor of the insured and against the insurer, providing coverage to the insured. *See, e.g., Chacon v. American Family Mut. Ins. Co.,* 788 P.2d 748, 750 (Colo.1990). *Cf. Sanchez v. Connecticut General Life Ins. Co.,* 681 P.2d 974, 977 (Colo.App.1984) (applying doctrine of reasonable expectations to ambiguous insurance policy language).

The policy states, in relevant part:

COVERED LOSS exists when in any calendar month the Insured's net income is less than eighty percent of Base Earnings solely as a result of a Covered Injury or Covered Sickness.

ELIMINATION PERIOD means the number of days following the Date of Covered Injury or Sickness for which no monthly benefit will be paid.

BENEFIT PERIOD means the period of Covered Loss which starts following an Elimination Period and ends on the last day of the Benefit Period shown on the Data Page. It also ends when the Insured does not have a Covered Loss for four months in a row.

 \* \* \* \* \* \*

MONTHLY BENEFIT. When the Insured has a Covered Loss while this policy is in force, [the Insurer] will pay a monthly benefit which is eighty percent of the Insured's Base Earnings less the Insured's Net Income for such month. The payments will begin after the end of the Elimination Period stated on the Data Page.

(Insurance Policy at 3–4, Plf.'s Ex. B.)

██ I conclude that the relevant portions of the policy are not ambiguous. The policy clearly requires Central United to pay monthly benefits even if the covered loss occurs during the last ninety days of the policy. A "covered loss" occurs when, "in *any* calendar month the Insured's net income is less than eighty percent of Base Earnings

solely as a result of a Covered Injury or Covered Sickness." (Insurance Policy at 3 (emphasis added), Plf.'s Ex. B.) The insurer must pay a monthly benefit when the insured has a covered loss "while the policy is in force." (Insurance Policy at 4.) Thus, as long as the insured suffers a covered loss in a calendar month while the policy is in force, the insurer must pay a monthly benefit. The policy, of course, remains "in force" as long as the insured pays premiums before the grace period expires. (Insurance Policy at 4.) The fact that the monthly benefit does not become payable until ninety days after the first diagnosis of the covered injury or sickness does not affect the insurer's responsibility to pay a monthly benefit. Rather, it merely establishes when the monthly benefits will commence. I conclude as to this policy, as a matter of law, that an insured who suffers a covered loss during a calendar month that falls within the last ninety days of the insurance policy is entitled to monthly benefits if the insured has kept the policy in force by paying premiums before the expiration of the grace period. Such monthly benefits are payable ninety days after the first diagnosis of a covered injury or sickness.

The clear and unambiguous language of the insurance policy simply does not support the Central United's interpretation. Even if I were to accept Central United's interpretation as plausible, Dr. Arenberg's interpretation is as reasonable and, therefore, the policy would have to be interpreted in his favor. *See Geralnes,* 583 F.Supp. at 838 (ambiguity exists when "a contract provision is reasonably and fairly susceptible of more than one meaning"); *Chacon,* 788 P.2d at 750 (ambiguous terms in an insurance contract are construed in favor of the insured and against the insurer).

Dismissal of Dr. Arenberg's "violation of public policy" claim is, however, proper. Because there is now no concern that the policy language prevents Dr. Arenberg from having any coverage for a loss that occurs during the last ninety days of the policy, there is no basis for severance or rescission of any policy provisions. As I have construed it, the policy does not run afoul of any identified public policy. Indeed, Dr. Arenberg fails to identi-

fy any specific public policy as prohibiting any portion of the insurance policy. Accordingly, I dismiss this claim.

### c. Estoppel / Waiver

Central United next moves for summary judgment regarding Dr. Arenberg's third claim for relief, entitled "estoppel / waiver." Dr. Arenberg alleges that, by retaining his February premium payment after having received his request to cancel the policy, Central United waived or is otherwise estopped from now claiming that the policy was canceled. He also contends that Central United advanced only one reason for denying his benefits claim, failure to incur a "covered loss" during the policy period, and, therefore, Central United has waived any other defenses it may have. (Am. Compl. ¶¶ 52–60; Pretrial Ord. of 3/10/98 at 5.) These claims are more properly characterized as two separate legal theories, equitable estoppel and waiver, respectively. I address each legal theory separately.

#### 1. *Equitable Estoppel*

 Dr. Arenberg does not allege that he relied to his detriment on any promise made by Central United. Rather, he alleges that he relied to his detriment on conduct, Central United's retention of his February premium payment. Thus, Dr. Arenberg's asserts the claim of equitable estoppel, not promissory estoppel. *See Berg v. State Bd. of Agriculture*, 919 P.2d 254, 259 (Colo.1996) (comparing and contrasting promissory estoppel and equitable estoppel). Unlike promissory estoppel which lies in contract, equitable estoppel lies in tort. *Board of County Comm'rs of Summit County v. DeLozier*, 917 P.2d 714, 716 (Colo.1996) (same). To establish a claim of equitable estoppel, "the party to be estopped must know the facts and either intend the conduct to be acted on or so act that the party asserting estoppel must be ignorant of the true facts, and the party asserting estoppel must rely on the other party's conduct with resultant injury." *Committee for Better Health Care for All Colorado Citizens by Schrier v. Meyer*, 830 P.2d 884, 891–892 (Colo.1992). The party asserting an equita-

ble estoppel claim must also demonstrate that he reasonably relied to his detriment upon the acts or representations of the other person and that he had no knowledge or convenient means of knowing the facts. *In re Marriage of Dennin and Lohf*, 811 P.2d 449, 450 (Colo.App.1991) (citing *Carey v. Carey*, 29 Colo.App. 328, 486 P.2d 38 (1971)).

 Central United argues that Dr. Arenberg cannot demonstrate he had no convenient means of knowing Central United deemed the policy canceled effective February 28, 1995. I agree. As argued by Central United, Dr. Arenberg could have inquired, by mail or telephone, whether Central United accepted, accepted with modification, or rejected his offer to cancel the insurance policy effective February 1, 1995. In his reply brief, Dr. Arenberg fails to respond to this argument with evidentiary support. Thus, no genuine issue of material fact exists regarding whether Dr. Arenberg had a convenient means of knowing the true facts. Central United is entitled, therefore, to judgment as a matter of law as to Dr. Arenberg's equitable estoppel claim.

#### 2. *Waiver*

Dr. Arenberg also contends that Central United advanced only one reason for denying his benefits claim, failure to incur a "covered loss" during the policy period, and, therefore, Central United has waived any other defenses it may have. (Am. Compl. ¶¶ 52–60; Pretrial Ord. of 3/10/98 at 5.) Waiver is a defense, not recognized claim for relief. Nonetheless, I address the parties' arguments pertaining to this legal issue which is an appropriate subject for summary judgment.

"Waiver is the voluntary abandonment or surrender by competent persons of a right known by them to exist, with the intent that such right shall be surrendered and such persons be forever deprived of its benefits." *Colorado Bank & Trust Co. v. Western Slope Investments, Inc.*, 36 Colo.App. 149, 152–153, 539 P.2d 501, 503 (1975). "Generally, an insurer must raise (or at least reserve) all defenses to coverage within a reasonable time after learning of such defenses. When

an insurer denies coverage on specific grounds, it waives the right later to assert additional defenses to coverage . . . ." *Public Service Co. of Colorado v. Wallis and Cos.,* 955 P.2d 564, 571 (Colo.App.1997). The failure to mention the notification in the preliminary letter does not, without more, constitute a waiver of that defense. *Haller v. Hawkeye–Security Ins. Co.,* 936 P.2d 601 (Colo. App.1997).

■ Central United contends that it has not waived its defense that Dr. Arenberg canceled the policy. On March 16, Central United received a letter from Dr. Arenberg dated March 10, 1995, which states:

Enclosed is check # 2306 in the amount of $431.60 for my March premium. I will continue to send this premium amount on a monthly basis rather that [sic] automated withdrawal from my checking account. Thank you for your help in this matter and please start sending me monthly statements for me to process my monthly payment by check.

(Ltr. from Dr. Arenberg to Life of America of 3/10/95, Plf.'s Ex. S.) By letter dated March 16, 1995, Central United returned check number 2306 to Dr. Arenberg:

Enclosed you will find your check number 2306, in the amount of $431.60, recently submitted for premium payment on the above referenced policy.

We are returning this payment to you as coverage provided by the policy has been canceled effective February 28, 1995, the date to which premiums were paid at the time we received your cancellation request, dated January 24, 1995. Enclosed for your reference is a copy of your letter requesting cancellation of coverage.

(Ltr. from Central United to Dr. Arenberg of 3/16/95, Plf.'s Ex. T.) On May 22, 1995, Central United received Dr. Arenberg's proof of claim. (Stip. ¶ 12, Pretrial Ord. of 3/10/98 at 10.) By letter dated July 13, 1995, Central United requested additional information in support of his claim. Dr. Arenberg supplied additional information. After a period of correspondence, Central United issued its final denial letter to Dr. Arenberg's counsel dated October 16, 1995, which letter states:

We have reviewed Dr. Arenberg's disability claim for which he submitted a claim form dated May 15, 1995, and have concluded that the subject Injury and Sickness Income Replacement policy does not provide coverage to him inasmuch as his covered sickness did not manifest itself until one (1) week before the policy was canceled. Therefore, the insured's net income had not yet dropped.

Enclosed please find a copy of Dr. Arenberg's January 24, 1995 letter in which he requested that his disability policy be canceled effective February 1, 1995. Because premiums had already been paid to February 28, 1995, on the date we received the notice of cancellation, the policy was canceled effective February 28, 1995.

A "covered loss" exists when in any calendar month the Insured's net income is less than eighty percent of base earnings solely as a result of a Covered Injury or Covered Sickness.

According to Dr. Christopher's February 7, 1995 report, Dr. Arenberg "has had no problems carrying out his job . . ." It was not until March 1, 1995 that Dr. Higgins communicated to Dr. Arenberg that he could no longer practice as a surgeon.

The financial records provided to us by your client show that his net income was never less than 80% of his base earnings, therefore, he is not entitled to benefits under the policy. The medical records provided by your client show that the covered sickness did not affect Dr. Arenberg's income ~~producing capability~~ until after our policy was canceled.

(Ltr. from Mary Lou Rainey to Thomas Roberts of 10/16/95 (strikeout in original), Def.'s Ex. 4.)

Central United has steadfastly maintained that the insurance policy was canceled effective February 28, 1995. Although it did not specifically use the terms "substantial performance" in its preliminary denial letter of March 16 or its final denial letter of October 16, Central United has unequivocally maintained that Dr. Arenberg's January 24 letter and its responsive conduct canceled the insurance policy effective February 28, 1995. Central United's contention that Dr. Aren-

berg failed to incur a "covered loss" while the policy was in force is simply another way of saying that the policy terminated effective February 28, 1995. Accordingly, I conclude that Central United has not waived its right to assert the defenses it has thus far advocated.

### d. Breach of Implied Covenant of Good Faith and Fair Dealing

■■■ As his fourth claim, Dr. Arenberg avers that Central United breached the policy in bad faith. Whether a defendant owes a legal duty to a particular plaintiff, as well as the scope of the duty, are questions of law for the court to resolve. *Bath Excavating & Const. Co. v. Wills,* 847 P.2d 1141, 1147 (Colo. 1993) (citations omitted). Pursuant to Colorado law, every contract contains an implied covenant of good faith and fair dealing. C.R.S. § 4–1–203 (1997 Repl.Vol. 2); *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo. 1995). In the past, Colorado restricted actions based upon breach of an implied covenant of good faith and fair dealing to contract damages. In *Farmers Group, Inc. v. Trimble,* 691 P.2d 1138 (Colo.1984), however, the Colorado Supreme Court held that an insured could recover in tort for an insurer's breach of its implied duty to act in good faith when defending actions brought by third-parties against the insured. *Trimble* at 1141–1142.

In *Travelers Ins. Co. v. Savio,* 706 P.2d 1258, 1272–1276 (Colo.1985), the Colorado Supreme Court extended the *Trimble* rationale to the relationship among workers' compensation insurance carriers and injured workers, even though workers are not in privity of contract with the insurance carrier. *Cf. Schnacker v. State Farm Mut. Auto. Ins. Co.,* 843 P.2d 102 (Colo.App.1992) (injured third-party claimant did not have standing to allege bad faith breach of insurance contract against tortfeasor's insurer). The Court reasoned that, because "workers compensation serves the same purpose as insurance in general, the *Trimble* rationale demands that the provider of such compensation deal fairly and in good faith with an employee asserting a compensable injury." *Savio* at 1273.

In *Savio,* the Colorado Supreme Court also held that, in the first-party context, an insurer acts in bad faith in delaying the processing of or denying a valid claim when: (1) the insurer's conduct is unreasonable; and (2) and the insurer knows that the conduct is unreasonable or recklessly disregards the fact that the conduct is unreasonable. *Id.* at 1275. The Court also defined the elements and required proof in detail:

The first element of this test—unreasonable conduct—was recognized in *Trimble* as the sole standard for the tort of bad faith dealing by an insurance carrier with its insured in a third-party setting. Whether an insurer has acted reasonably in denying or delaying approval of a claim will be determined on an objective basis, requiring proof of the standards of conduct in the industry.

The second element of the test reflects a reasonable balance between the right of an insurance carrier to reject a non-compensable claim submitted by its insured and the obligation of such carrier to investigate and ultimately approve a valid claim of its insured. If an insurer does not know that its denial of or delay in processing a claim filed by its insured is unreasonable, and does not act with reckless disregard of a valid claim, the insurer's conduct would be based upon a permissible, albeit mistaken, belief that the claim is not compensable. While the distinction is subtle, recognition of the permissible scope of an insurer's right to refuse invalid claims requires the conclusion that in the context of a first-party claim the insured must establish the insurer's knowledge or reckless disregard of the fact that a valid claim has been submitted.

*Id.*

■■■ Central United argues that its denial of Dr. Arenberg's claim for benefits was "in conformance with the unambiguous provisions of the Policy" because he "deliberately and unequivocally canceled the policy . . . ." (Def.'s Mot. Summ. J. Brf. at 25.) Obviously, Central United's argument assumes that the jury will conclude in its favor on the substantial performance issue. Yet viewing the evidence in a light most favorable to Dr. Aren-

berg, a reasonable jury could conclude that Central United failed to accept Dr. Arenberg's offer of cancellation by rendering substantial performance.

Nonetheless, Central United is entitled to summary judgment on Dr. Arenberg's bad faith breach of insurance contract claim. Central United, after an ample period of investigation, rejected Dr. Arenberg's claim as non-compensable because Central United believed the contract terminated effective February 28, 1995. Although Central United did not use the words "substantial performance" in its preliminary or final denial letters, Central United has argued from the inception that it accepted Dr. Arenberg's offer of cancellation by rendering substantial performance. Disputed issues of fact exist regarding substantial performance and a reasonable jury could find in favor of either party regarding that issue. Even if the jury finds in favor of Dr. Arenberg on the substantial performance question, Central United's denial was based on a "permissible, albeit mistaken, belief that the claim is not compensable." *Savio,* 706 P.2d at 1275. Thus, no reasonable jury could conclude that Central United knew or recklessly disregarded that its decision to deny benefits was unreasonable. I grant, therefore, Central United's motion for summary judgment as to Dr. Arenberg's insurance bad faith claim.

Accordingly, I ORDER that:

(1) defendant's motion to reconsider and clarify is GRANTED;

(2) the Court's order entered on July 16, 1998 is VACATED;

(3) defendant's motion to certify the July 16, 1998 order as final and appealable is DENIED as moot;

(4) plaintiff's motion for partial summary judgment is DENIED;

(5) defendant's motion for summary judgment is GRANTED as to plaintiff's claim of violation of public policy, plaintiff's equitable estoppel claim, the issue of waiver, and plaintiff's breach of implied covenant of good faith and fair dealing claim; defendant's motion for summary judgment is otherwise DENIED;

(6) plaintiff's equitable estoppel, violation of public policy, and breach of implied covenant of good faith and fair dealing claims are DISMISSED with prejudice; and

(7) because I neither reviewed nor relied on the exhibits referenced by defendant in its motion to strike, defendant's motion to strike is DENIED as moot.